# IN THE COURT OF APPEALS OF IOWA

No. 18-1864
Filed March 18, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**HAROLD LAMORN DUDLEY,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.**


Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant

Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney

General, for appellee.


Heard by Tabor, P.J., and Mullins and Schumacher, JJ.

**SCHUMACHER, Judge.**

A defendant appeals from convictions of first-degree murder and first-degree burglary. On appeal, he argues he received ineffective assistance of counsel and that the sentencing court made several procedural errors. We affirm the convictions, reject the ineffective-assistance claim, and vacate the portion of the sentencing order related to restitution for court costs, remanding the case for recalculation.

**I. Facts and Procedural Background**

Harold Dudley (Dudley) filed a petition for dissolution from Mary Dudley (Mary) in April 2017. Subsequently, Mary moved to an apartment complex, where she lived for approximately fifty-two days prior to the events leading to Dudley's arrest and subsequent convictions for murder in the first degree and robbery in the first degree.

Around midnight on June 2, 2017, Charlene Lange, a friend of Mary's and a resident of the same apartment complex, noticed Dudley's car in the apartment parking lot in the far corner. She recognized the car from Dudley's frequent visits to the complex and would later describe it as "tan or goldish-color." The next morning at 9:15 a.m., Mary called 911 requesting assistance because Dudley was trying to the pick the lock on her apartment's front door. In that call, Mary identified Dudley's car as a gold Buick and gave the license plate number. Mary texted Charlene about Dudley's attempt to pick the lock to Mary's front door and requested Charlene to come sit with her until law enforcement arrived. Charlene passed Dudley on the stairs. She declined Dudley's request to converse with him and continued to Mary's apartment. As Mary opened the door to let Charlene

enter, Dudley raced down the hallway toward Mary's apartment. Charlene and Mary managed to shut and lock the door just prior to Dudley reaching the doorway. Dudley struck the door several times, knocking it down. After entering, Dudley said, "Bitch, I got you" and fired a gun six times at Mary, killing her.[1] Charlene fled to her apartment. Dudley exited the apartment complex and drove to Ames to meet his nephew and pastor, Orlando McClain, with whom he had been texting in the hours prior to the murder and in the minutes afterward. Prior to the murder, the following texts were exchanged:

> Dudley: There is a spirit on me and in the air and I see it. I need some prayer bad!!!
> McClain: Alright I will pray for you.
> Dudley: Thanks
> McClain: No problem
> Dudley: Make it a strong PRAYER! !!!
> McClain: I'll lay hands on you when you come.
> Dudley: Thank you! !!#
> Dudley: Im on my way out to your place if its not a problem cause Im really going through!!! If not i will take care of this. Now!!!#
> McClain: I'm at the church

Following the murder, Dudley resumed texting McClain:

> Dudley: i merki killed her
> McClain: I hope you have did anything crazy[2]
> Dudley: She dead
> McClain: What!!!!!!
> Dudley: Yea
> Dudley: Heading your way
> McClain: If that is true, you need to turn yourself into the police now!!!!!!
> Dudley: Vits done
> McClain: Where you at?

---

[1] While there were various references at trial to Dudley discharging five shots, the medical examiner testified concerning six bullet wounds. Six shell casings were recovered.

[2] At trial, McClain testified that he intended to type "haven't" but mistakenly typed "have" instead.

This exchange of text messages prompted McClain to call 911. Police Officer Ryan Hauge of the Ames Police Department was dispatched to House of Refuge, where McClain pastors and where he was located when he called 911. Upon arrival, McClain showed Officer Hauge the text-message exchange. Officer Hauge called for backup. Minutes later, Dudley arrived in the parking lot in a gold Buick Lucerne and was taken into custody. Following a jury trial, Dudley was convicted of murder in the first degree and burglary in the first degree.

## II. Standard of Review

We review ineffective-assistance-of-counsel claims de novo. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). We examine claims of error in sentencing procedures and restitution orders for correction of errors at law. Iowa R. App. P. 6.907; *State v. Albright*, 925 N.W.2d 144, 158 (Iowa 2019).

## III. Discussion

On appeal, Dudley argues he received ineffective assistance of counsel because trial counsel failed to object to the statements he made to McClain. He also assigns error to the trial court's failure to orally state on the record the reasons for running his sentences consecutively instead of concurrently. Lastly, he argues the order assessing court costs was in error because the court failed to address his reasonable ability to pay.

### A. Ineffective Assistance of Counsel

First, Dudley argues he received ineffective assistance of counsel because his trial counsel failed to object to the introduction of his messages with McClain

and McClain's testimony regarding the message exchange.[3]  Although McClain is Dudley's nephew, Dudley asserts the text messages are protected by the clergy privilege because McClain is also his pastor.

> If we find ineffective assistance, a defendant's failure to preserve error in the trial court may be excused.  *State v. Lucas*, 323 N.W.2d 228, 232 (Iowa 1982).  In order to establish ineffective assistance, the defendant must show that [his] trial counsel failed to perform an essential duty, and this failure prejudiced [him].  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Both elements must be shown by a preponderance of the evidence.  *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001).
>      To meet the first element of the *Strickland* test, counsel's performance is measured against the standard of a reasonably competent practitioner with the presumption that the attorney performed his duties in a competent manner.  *Strickland,* 466 U.S. at 689.  In order to satisfy the prejudice element, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different."  *Id.* at 694.

*State v. Begey*, 672 N.W.2d 747, 749 (Iowa 2003).

"We normally preserve ineffective-assistance-of-counsel claims for postconviction relief" proceedings, but "we will address such claims on direct appeal when the record is sufficient to permit a ruling."  *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).  Reserving such claims for postconviction proceedings "allow[s] full development of the facts surrounding counsel's conduct."  *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997).  "Only in rare cases will the trial record

---

[3] We recognize Iowa Code section 814.7 was recently amended to provide in pertinent part: "An ineffective assistance of counsel claim in a criminal case shall be determined by filing an application for postconviction relief" and "shall not be decided on direct appeal from the criminal proceedings." *See* 2019 Iowa Acts ch. 140, § 31.  In *State v. Macke*, however, our supreme court held the amendment "appl[ies] only prospectively and do[es] not apply to cases pending on July 1, 2019." 933 N.W.2d 226, 235 (Iowa 2019).  We are bound by our supreme court's holding.  We conclude, therefore, the amendment "do[es] not apply" to this case, which was pending on July 1, 2019.  *Id.*

alone be sufficient to resolve the claim." *Id.* We are particularly likely to preserve ineffective-assistance-of-counsel claims "where the challenged actions of counsel implicate trial tactics or strategy which might be explained in a record fully developed to address those issues." *State v. Rubino*, 602 N.W.2d 558, 563 (Iowa 1999). We also preserve ineffective-assistance claims if "the present record does not allow us to decide if such tactic or strategy was reasonable, under prevailing professional norms." *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012).

Here, we find the record sufficient to address Dudley's claim of ineffective assistance because the record contains overwhelming evidence of the elements of first-degree murder and first-degree burglary. We conclude that Dudley is unable to prove prejudice.

Because the defendant's trial strategy with respect to the murder count was to seek to lower the conviction from first-degree murder to second-degree murder, if there was a reasonable probability of a verdict of second-degree murder had the text messages been excluded, Dudley could succeed in proving the prejudice prong of a claim of ineffective assistance of counsel. *See Begey*, 672 N.W.2d at 749. Dudley was charged with premeditated first-degree murder under Iowa Code section 707.2(1)(a) (2017). This species of first-degree murder differs from second-degree murder by requiring proof that the killing was perpetrated "willfully, deliberately, and with premeditation." Iowa Code § 707.2(1)(a). Additionally, a conviction for first-degree murder requires proof of specific intent to kill. *State v. Serrato*, 787 N.W.2d 462, 469 (Iowa 2010).

These elements of first-degree murder are supported by overwhelming evidence. Lange observed the defendant's car in the apartment complex parking

lot around midnight before the morning of the murder. The defendant attempted to pick the lock on the victim's door within hours of the murder. The defendant attempted to stop Lange and speak with her in a stairwell just down the hall from Mary's apartment. Footage from the apartment complex's surveillance camera shows the defendant waiting just beyond the hallway leading to Mary's apartment. When Mary opened the door to let Lange in, the defendant revealed himself and raced toward the open door. Though Mary and Lange managed to close and lock the door, the defendant knocked the door in to gain entry. The defendant shot Mary multiple times. The sum of these facts precludes us from finding any reasonable probability of a different result had the text messages been excluded. Since we hold there is no reasonable probability that the exclusion of the text messages would have led to a conviction for second-degree murder, the defendant cannot succeed on the prejudice prong of a claim of ineffective assistance of counsel with respect to the murder charge.

Dudley also contends that the contested text messages "affected . . . the first-degree burglary conviction (requiring the jury to find that Dudley intended to commit a felony or assault when he broke into Mary's apartment)." We find the text messages to be substantially less relevant to the burglary charge than they are to the elements of first-degree murder. However, assuming arguendo the text messages are relevant to the burglary charge, the record evidence supporting the elements of first-degree burglary is so overwhelming that we conclude the defendant cannot show a reasonable probability of a different result with respect to the burglary charge had the text messages been excluded. We therefore reject

Dudley's ineffective-assistance-of-counsel claim to the extent it references the burglary charge.

Defense counsel points out that the State heavily relied on the text messages in seeking to prove the premeditation and intent elements of first-degree murder, particularly during closing arguments. We agree with this characterization of the State's closing argument, but we nonetheless find the significant evidence of specific intent to kill, premeditation, willfulness, and deliberation to be determinative.

**B. Restitution Calculation**

Dudley argues the district court erred in assessing court costs against him in the written sentencing order without making a determination of his reasonable ability to pay. We agree that a remand is necessary for a partial recalculation of Dudley's restitution obligations.

The court stated at the sentencing hearing: "[Defense counsel], would you agree that your client's ability to pay any attorney's fees back is zero?" Defense counsel agreed, and the court said, "I will enter that." The court did not inquire as to Dudley's reasonable ability to pay court costs. However, in the written sentencing order filed on October 26, 2018, the court ordered Dudley to pay court costs.

In the time since the court entered the sentencing order, the Iowa Supreme Court decided *State v. Albright*, 925 N.W.2d 144 (Iowa 2019), which requires we vacate and remand for a partial recalculation of restitution.

In *Albright*, the Iowa Supreme Court identified two categories of restitution, the first of which includes restitution to victims and to the clerk of court for fines,

penalties, and surcharges. 925 N.W.2d at 159. The second category includes restitution

> for crime victim assistance reimbursement, restitution to public agencies pursuant to section 321J.2, subsection 13, paragraph "b", court costs including correctional fees approved pursuant to section 356.7, court-appointed attorney fees ordered pursuant to section 815.9, including the expense of a public defender, when applicable, contribution to a local anticrime organization, or restitution to the medical assistance program pursuant to chapter 249A.

*Id.* (quoting Iowa Code § 910.2(1)). The court can only order restitution for items in this second category to the extent the offender has the reasonable ability to pay. *Id.* The court costs imposed by the written sentencing order are a portion of the second category of restitution, which require a reasonable-ability-to-pay determination. Such determination is lacking in the record. Therefore, pursuant to *Albright*, we vacate the portion of the Dudley's sentence having to do with category II restitution and remand for a calculation of this category of restitution under *Albright.*

### C. Sentencing Rationale

Dudley argues the sentencing court failed to give reasons on the record for imposing consecutive sentences. We disagree.

Iowa Rule of Criminal Procedure 2.23(3)(d) requires district courts to "state on the record its reason for selecting the particular sentence." This rule "applies to the district court's decision to impose consecutive sentences." *State v. Hill*, 878 N.W.2d 269, 273–74 (Iowa 2016) (citing *State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000)). Although a court may rely on the same reasons for imposing a sentence of incarceration as it does in determining whether sentences should run

concurrently or consecutively, the district court must "explicitly state the reasons for imposing a consecutive sentence." *Id.*

A "terse and succinct" statement may be sufficient to satisfy rule 2.23(3)(d) "so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing discretion." *State v. Thacker*, 862 N.W.2d 402, 408 (Iowa 2015) (quoting *State v. Johnson*, 445 N.W.2d 337, 343 (Iowa 1989)). The Iowa Supreme Court has "rejected a boilerplate-language approach that does not show why a particular sentence was imposed in a particular case." *Id.* However, a "terse and succinct" statement will suffice if "the statement in the context of the record demonstrates what motivated the district court to enter a particular sentence." *Id.* at 410. A district court can satisfy the requirements of rule 2.23(3)(d) "by orally stating the reasons on the record or placing the reasons in the written sentencing order." *State v. Thompson*, 856 N.W.2d 915, 919 (Iowa 2014).

Here, we find the sentencing court properly stated the reasons for imposing concurrent sentences. First, we consider the court's oral pronouncement at sentencing. The court listed the reasons for imposing sentence, saying,

> The punishment for the crime is mandatory by state law, and the court has no discretion in that regard. In any event, if the court did have discretion, the court would give the exact same sentence as required by law. This whole act was basically, in the court's mind, an execution. The victim kneeling down, her hands on top of her head hoping, perhaps, it would stop the bullets or awaiting the inevitable end. In any event, five shots did enter her body, and her life ended cruelly. The court finds that the defendant is hereby adjudged guilty of Count I, murder in the first degree, in violation of the Code of Iowa, and sentenced to a term of incarceration or imprisonment for the rest of his life. Count II, found guilty of burglary in the first degree, sentenced to a term of 25 years in prison. The sentences shall run consecutive to each other. The court, of course,

has no discretion other than to give a life sentence, and this court has already stated, even if it could, it would still impose a life sentence. The court has considered all the sentencing considerations under [section] 907.5 of the Code of Iowa.

After the sentencing hearing, the court issued a written sentencing order, in which the court checked a box indicating the sentences would run consecutively based on "the separate and serious nature of the offenses." This statement sufficiently explained the court's reasons for imposing concurrent sentences for the purposes of rule 2.23(3)(d). *Id.* at 919; *see also State v. Carberry*, 501 N.W.2d 473, 478 (Iowa 1993) (finding an "extremely terse" explanation sufficient where it was "reasonably clear from what was said that the judge imposed consecutive sentences based on his perception of the aggregate culpability of two separate and distinct heinous offenses").

## IV. Conclusion

We find the sentencing court sufficiently stated reasons on the record for the imposition of consecutive sentences, and we affirm. We reject the defendant's ineffective-assistance-of-counsel claim. We vacate the portion of the sentencing order related to category II restitution and remand for a recalculation of restitution in accordance with *Albright*.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING.**